FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| INTERNATIONAL FLAVORS & FRAGRANCES INC., | : <br> : <br> : <br> : Civil No. 06-2655 (FSH) |
| Plaintiff, | : <br> : **ORDER and OPINION** |
| v. | : <br> : Date: September 12, 2008 |
| McCORMICK & COMPANY, INC., | : <br> : |
| Defendant. | : <br> : |

**HOCHBERG, District Judge**

This matter is before the Court upon Defendant McCormick & Company, Inc.'s ("McCormick") motion for partial summary judgment as to Plaintiff's Counts III and IV pursuant to Federal Rule of Civil Procedure 56. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000. The Court has considered the arguments of the parties pursuant to Federal Rule of Civil Procedure 78.

I. FACTS[1]

IFF is a New York corporation, headquartered in New York City, with manufacturing facilities in New Jersey and Texas. McCormick is a Maryland Corporation, headquartered in Maryland, with warehousing facilities in Maryland. McCormick is a wholesale supplier of paprika to IFF.

---

[1]The following facts, except where noted or cited to the complaint, are undisputed.

On July 28, 2003, McCormick shipped approximately 5,000 pounds of paprika to IFF's New Jersey plant (referred to by the parties as "IFF Dayton" or "IFF New Brunswick"). On July 31, 2003, McCormick shipped approximately 10,000 pounds of paprika to IFF's Carrollton, Texas plant ("IFF Carrollton"). Both of these shipments were taken from Lot 1202, a 45,000 pound lot that McCormick received from its supplier on July 22, 2003. On October 7, 2003 McCormick sent another shipment of 4,000 pounds of paprika to IFF's Carrollton plant. This shipment was from Lot 1206.

On or around October 9, 2003, IFF Dayton discovered that the paprika powder it had received from McCormick was infested with cigarette beetles. Second Amended Complaint ("Compl.") ¶ 13. IFF Dayton isolated the infested paprika and directed IFF Carrollton to inspect its paprika for beetles. Id. IFF Carrollton discovered that its paprika – also from Lot 1202 – was infested. Compl. ¶ 14. IFF notified McCormick of the infested paprika in "mid-October." In response to IFF's notification, McCormick asked to inspect the areas at the IFF Carrollton and IFF Dayton plants where the paprika had been stored (the paprika was moved to trailers after the infestation was discovered), but IFF denied the request. McCormick allowed IFF to return all of the remaining McCormick paprika from both warehouses.

IFF used a portion of the Lot 1202 paprika stored in its Carrollton, TX facility to make barbeque seasoning for Frito-Lay. See Compl. ¶ 15 ("IFF then determined that a portion of the contaminated paprika power had been incorporated into IFF's BBQ seasoning at IFF Carrollton, and, accordingly, IFF isolated all remaining stock of that product. IFF also notified its customers who had purchased the BBQ seasoning which incorporated the contaminated lots of paprika powder."). IFF halted shipments of the barbeque seasoning when it learned of the beetle

infestation. Frito-Lay informed IFF that it would not accept any barbeque seasoning from IFF's current inventory. IFF alleges that it incurred "significant expense" attempting to supply Frito-Lay with barbeque seasoning from an alternate source.

IFF brings claims for breach of express warranty (Count I), breach of implied warranty (Count II), products liability (Count III), and fraudulent concealment/legal fraud (Count IV). McCormick has moved for partial summary judgment on IFF's product liability and fraud claims.

## II. STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Accordingly, "summary judgment may be granted only if there exists no genuine issue of material fact." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988). A fact is material if it might affect the outcome of the case, and an issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. All facts and inferences must be construed "in the light most favorable to the non moving party." Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). Further, summary judgment may be granted if the nonmoving party's "evidence is merely colorable, or is not significantly probative." Anderson, 477 U.S. at 249-50 (internal citations omitted).

### III. ANALYSIS

#### A. Count III – Products Liability

The gravamen of Plaintiff's product liability claim is that "[t]he paprika powder supplied to IFF by McCormick was defective", Compl. ¶ 32, and "IFF suffered injury and incurred damages relating to its flavor products which incorporated the contaminated paprika powder supplied by McCormick." Compl. ¶ 34. More specifically, Plaintiff alleges that the defective paprika damaged the barbeque seasoning into which the paprika was ultimately incorporated, and this damage 'is in the nature of a tort.' Defendant moves to dismiss Plaintiff's product liability claim on the ground that it is precluded by the economic loss doctrine. Under the economic loss doctrine "a plaintiff cannot sue in tort to recover for purely monetary loss – as opposed to physical injury or property damage – caused by the defendant." BLACK'S LAW DICTIONARY 552 (8th ed. 2004).

##### 1. Choice of Law

"As this is a diversity case, we must apply the choice of law principles of . . . the forum state[] to determine what law governs this dispute." DL Res., Inc. v. FirstEnergy Solutions Corp., 506 F.3d 209, 216 (3d Cir. 2007) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941)). New Jersey "currently subscribe[s] to the more flexible governmental-

interests analysis." Rowe v. Hoffman-La Roche, Inc., 917 A.2d 767, 771 (N.J. 2007). The governmental interest approach requires a two-step analysis:

> "The first step in the analysis is to determine whether a conflict exists between the laws of the interested states. Any such conflict is to be determined on an issue-by-issue basis." If there is no actual conflict, then the choice-of-law question is inconsequential, and the forum state applies its own law to resolve the disputed issue.
>
> If there is an actual conflict, the second step "seeks to determine the interest that each state has in resolving the specific issue in dispute." The Court must "identify the governmental policies underlying the law of each state" and determine whether "those policies are affected by each state's contacts to the litigation and to the parties." We must apply the law of "the state with the greatest interest in governing the particular issue."

Id. (internal citations omitted) (quoting Veazey v. Doremus, 510 A.2d 1187, 1189 (N.J. 1986)).[2]

---

[2] If the Court reaches the second step of the choice-of-law analysis, the Restatement lists several relevant factors to determine which state has the most significant relationship to a tort claim.

> The factors are: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." The most important of those is the competing interests of the states. As discussed in Fu, the initial focus "should be on 'what [policies] the legislature or court intended to protect by having that law apply to wholly domestic concerns, and then, whether these concerns will be furthered by applying that law to the multi-state situation.'"

Erny v. Estate of Merola, 792 A.2d 1208, 1217 (N.J. 2002) (internal citations omitted) (quoting Fu v. Fu, 733 A.2d 1133, 1142 (N.J. 1999)). In tort claims that sound in fraud, New Jersey courts look to the additional factors enumerated in the Restatement:

> The Restatement [(Second) Conflict of Laws § 148(2)(a)-(f)] enumerates six contacts[:]
> (a) the place . . . where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, (d) the . . . place of incorporation and place of business of the parties . . . (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time and (f) the place where the

Both New Jersey law and Texas law are implicated by Plaintiff's product liability claim. New Jersey law is implicated because New Jersey is the forum state for the instant litigation. Defendant argues that Texas law is implicated because the only paprika used to make barbeque seasoning for Frito Lay was the portion shipped to and stored in IFF's Texas facility.[3]  See Compl. ¶ 15.  Having identified the "interested states" and the legal question before the Court, the Court must turn to the first step of its choice of law analysis "to determine whether a conflict exists between the laws of the interested states." Rowe, 917 A.2d at 771.

Both Texas and New Jersey have adopted the economic loss doctrine to limit the scope of product liability claims.  See Paramount Aviation Corp. v. Agusta, 288 F.3d 67, 70 (3d Cir. 2002) (citing Spring Motors Distribs., Inc. v. Ford Motor Co., 489 A.2d 660, 663 (N.J. 1985), and noting that "[t]he Supreme Court of New Jersey held 'that a commercial buyer seeking damages for economic loss resulting from the purchase of defective goods may recover from an immediate seller and a remote supplier in a distributive chain for breach of warranty under the [Uniform Commercial Code], but not in strict liability or negligence.'"); Nobility Homes of Tex., Inc. v. Shivers, 557 S.W.2d 77, 80 (Tex. 1977) ("'There is a distinction between physical harm, or damage, to property and commercial loss.'  We agree and hold that strict liability does not apply to economic losses.") (internal citation omitted).  Further, under both New Jersey and

---

        plaintiff is to render performance under a contract which he has been
        induced to enter by the false representations of the defendant.

Pratt v. Panasonic Consumer Elecs. Co., 2006 WL 1933660, *12 (N.J. Super. Ct. Law Div. July 12, 2006) (internal citations omitted).

    [3]     Plaintiff argues that New Jersey law should apply.  Defendant argues in the alternative that the Court should grant partial summary judgment on Plaintiff's product liability claim even under New Jersey law.

Texas law, a plaintiff cannot bring a product liability claim for damage "to the product itself." Under New Jersey's Products Liability Act ("PLA"), product liability arises when the product causing the alleged harm was not reasonably fit for its intended purpose. N.J. STAT. ANN. § 2A:58C-2. The PLA defines "harm" as "physical damage to property, <u>other than to the product itself</u>." N.J. STAT. ANN. § 2A:58C-1(b)(2) (emphasis added). Similarly, the Texas Supreme Court has explained that "[i]n transactions between a commercial seller and commercial buyer, when no physical injury has occurred to persons or other property, injury to the defective product itself is an economic loss governed by the UCC." <u>Midcontinent Aircraft Corp. v. Curry County Spraying Serv., Inc.</u>, 572 S.W.2d 308, 313 (Tex. 1978). To recover for strict liability under Texas Law, "the damage to property must be to property <u>other than the product itself</u>." <u>Helen of Troy, L.P. v. Zotos Corp.</u>, 511 F. Supp. 2d 703, 721 (W.D. Tex. 2006) (emphasis added).

Plaintiff concedes that it cannot bring a product liability claim based on the damaged paprika, which is "the product itself" under both Texas and New Jersey law. The parties disagree, however, as to whether the barbeque seasoning that incorporated, and was allegedly damaged by, the contaminated paprika is "property other than the product itself" under Texas or New Jersey law, and whether such damage can support a product liability claim.

Neither New Jersey nor Texas state courts have explicitly addressed the question of whether a final product that has been damaged by a defective component is "the product itself."[4]

---

[4] Defendant cites to several factually similar cases in which Texas federal courts have interpreted Texas state law to preclude a product liability claim like Plaintiff's. Those federal courts acknowledged, however, that the issue had not been addressed by Texas state courts, and that they were predicting what Texas state courts would do if faced with the issue. See, e.g., <u>Alcan Aluminum Corp. v. BASF Corp.</u>, 133 F. Supp. 2d 482, 504-05 (N.D. Tex. 2001) ("The court finds these rationales persuasive and believes that, if faced with the issue, Texas courts would come to the same conclusion. . . ."). Federal court decisions predicting how a state

Because both Texas and New Jersey state law limit product liability claims to "damage to property other than the product itself," and because no court in either state has addressed the meaning of "property other than the product itself" on facts that compel the outcome of this case, the Court finds that there is no "actual conflict" between Texas law and New Jersey law on this issue. Because "there is no actual conflict, . . . the choice-of-law question is inconsequential, and the forum state applies its own law to resolve the disputed issue." Rowe, 917 A.2d at 771.

2. Predicting how the New Jersey Supreme Court Would Rule

The Court must now determine how the New Jersey Supreme Court would interpret the phrase "physical damage to property, other than to the product itself" as it is used in N.J. STAT. ANN. § 2A:58C-1(b)(2). "[B]ecause the New Jersey Supreme Court has yet to consider this issue, it [i]s the duty of the district court to predict how the New Jersey Supreme Court would rule if faced with the issue." British Ins. Co. of Cayman v. Safety Nat. Cas., 335 F.3d 205, 211 (3d Cir. 2003). "In predicting how the highest court of the state would resolve the issue, [the Court] must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable date [sic] tending convincingly to show how the highest court in the state would decide the issue at hand." Id. (internal quotations and citations omitted).

*a. New Jersey Cases*

The Court's analysis begins with Spring Motors Distribs. v. Ford Motor Co., 489 A.2d

---

might decide a particular issue are not binding on the state, and a state court is free at any time to reach a contrary conclusion. For that reason, the Court will not rely solely on Defendant's federal cases to determine whether there is an "actual conflict" between the law of Texas and the law of New Jersey. To the extent that the Texas federal cases are instructive as to how the New Jersey Supreme Court would rule if faced with the issue, the cases are discussed below.

8

660 (N.J. 1985), in which the New Jersey Supreme Court first adopted the economic loss doctrine.[5] In Spring Motors the New Jersey Supreme Court examined the history of strict liability and the Uniform Commercial Code in New Jersey and concluded that "the U.C.C. is the more appropriate vehicle for resolving commercial disputes arising out of business transactions between persons in a distributive chain." 489 A.2d at 668. The court reasoned that

> As a general rule, the rights and duties of a buyer and seller are determined by the law of sales, which throughout this century has been expressed first in the Uniform Sales Act and more recently in the U.C.C. . . . [S]trict liability evolved as a judicial response to inadequacies in sales law with respect to consumers who sustained physical injuries from defective goods made or distributed by remote parties in the marketing chain.

Id. at 670. The court then addressed the importance of the relative bargaining power between the contracting parties, concluding that:

> The considerations that give rise to strict liability do not obtain between commercial parties with comparable bargaining power. . . . Indeed, a commercial buyer, such as Spring Motors, may be better situated than the manufacturer to factor into its price the risk of economic loss caused by the purchase of a defective product. . . . As between commercial parties, then, the allocation of risks in accordance with their agreement better serves the public interest than an allocation achieved as a matter of policy without reference to that agreement.

Id. at 670-01 (internal citations omitted). Finally, the court noted "[b]y enacting the U.C.C., the Legislature adopted a carefully-conceived system of rights and remedies to govern commercial transactions. Allowing [plaintiff] to recover from [defendant] under tort principles would dislocate major provisions of the Code." Id. at 671.

---

[5] Although Spring Motors was decided before the New Jersey PLA was enacted in 1987, state and federal courts in New Jersey continue to rely on Spring Motors for its discussion of the principles that undergird the economic loss doctrine in this state. See, e.g., Paramount Aviation Corp. v. Agusta, 288 F.3d 67, 70-71 (3d Cir. 2002); Capitalplus Equity, LLC v. Prismatic Dev. Corp., 2008 WL 2783339, at *6 (D.N.J. 2008); Alloway v. Gen. Marine Indus., L.P., 695 A.2d 264, 269-70 (N.J. 1997).

The New Jersey Supreme Court again discussed the intersection of tort and contract principles in Alloway v. General Marine Industries, L.P., 695 A.2d 264, 267-75 (N.J. 1997). The court explained that "[t]ort principles more adequately address the creation of an unreasonable risk of harm when a person or other property sustains accidental or unexpected injury. When, however, a product fails to fulfill a purchaser's economic expectations, contract principles, particularly as implemented by the U.C.C., provide a more appropriate analytical framework." Alloway, 695 A.2d at 268 (internal citations omitted). The New Jersey Supreme Court's analyses in Spring Motors and Alloway generally counsel in favor of limiting IFF to contract remedies.

*b. Cases in Other Jurisdictions that Focus on the Principles of the Economic Loss Doctrine*

Courts in the Third, Fourth and Eighth Circuits have addressed the economic loss doctrine generally, and relied on the doctrine to limit the reach of the "other property" exception to the doctrine. The Third Circuit's interpretation of New Jersey law in In re Merritt Logan, Inc., 901 F.2d 349 (3d Cir. 1990), supports the conclusion that Plaintiff may not pursue a tort claim under New Jersey law on the facts presented. In Merritt Logan, the defendant sold an allegedly defective refrigeration system to plaintiff, the operator of a neighborhood grocery store. Plaintiff brought both contract and tort claims to recover economic loss from the defective product and the damage it caused to other property, such as food stocks. Id. at 362. At trial, the district court judge denied defendant's motion for partial summary judgment on the tort claim, and after trial, denied defendant's motion for a directed verdict on the tort claim. Id. at 361. On appeal, the defendant challenged the jury award on the ground that the district court erred in submitting the tort claim to the jury. Id. at 353. The Third Circuit noted that the controlling case was Spring

10

Motors.  See id. at 361.

Like IFF in the instant case, in Merritt Logan, the plaintiff argued that "because the defective refrigeration system caused damage to other property, namely, food stocks, [plaintiff] argues it can recover either in tort or for breach of warranty under New Jersey law."  Id. at 362.  The Third Circuit rejected plaintiff's argument and determined that damages to plaintiff's food stocks "occurred at the core of a commercial transaction," id. at 362, and were therefore recompensable only in contract.  The court reasoned that

> The idea that the parties take the possibility of consequential damage into account in setting the price when they decide to exclude or include those damages from warranty coverage is apparent in a case between buyer and seller, like Spring Motors and the one before us. It is less apparent and more difficult to apply the concept of a negotiated price fairly in the context of damage from the general risks of accident.

Id. at 362.  The Third Circuit reversed the district court's decision to submit the tort claim to the jury, but affirmed the jury award on the alternative ground that it was proper under a breach of warranty theory.[6]  Id. at 353.

---

[6] The Third Circuit's affirmation of the jury verdict on alternative grounds demonstrates that IFF can adequately seek compensation for its full economic loss even if it is prohibited from pursuing its strict liability claim.  As the New Jersey Supreme Court explained,

> economic loss encompasses actions for the recovery of damages for costs of repair, replacement of defective goods, inadequate value, and consequential loss of profits.  Economic loss further includes "the diminution in value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold."

Alloway, 695 A.2d at 267 (internal citations omitted).  "A consumer, moreover, may recover incidental and consequential damages."  Alloway, 695 A.2d at 269.  Under the UCC, those terms are defined as follows:

> (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of

11

The Third Circuit's analysis in <u>Merritt Logan</u> is instructive.  Although the Third Circuit did not explicitly address the meaning of "property, other than the product itself," the Third Circuit's decision limited the effect of the "other property" exception by declining to construe it in a way that would undermine the economic loss doctrine generally.  The damaged food stocks in <u>Merritt Logan</u> were separate and distinct from the allegedly defective refrigerator.  Yet, the Third Circuit held that the New Jersey Supreme Court would not permit a tort claim where the damage "occurred at the core of a commercial transaction".  <u>Id.</u> at 362.  Similarly, in this case, the incorporation of the paprika into the barbeque seasoning occurred at the core of a commercial transaction.

The Fourth Circuit reached a similar conclusion in <u>Palmetto Linen Serv., Inc. v. U.N.X., Inc.</u>, 205 F.3d 126, 128-30 (4th Cir. 2000).  In <u>Palmetto</u>, a defective chemical dispensing system for commercial washers caused damage to the plaintiff's linens.  The plaintiff sued in tort and contract, arguing that the tort claim was proper under South Carolina law because the linens were "other property" for purposes of South Carolina's economic loss rule.  The Fourth Circuit rejected this argument, reasoning that

---

goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include
(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
(b) injury to person or property proximately resulting from any breach of warranty.

N.J. S<small>TAT</small>. A<small>NN</small>. § 12A:2-715.

> Although the economic loss rule generally does not apply where other property damage is proven, courts have tended to focus on the circumstances and context giving rise to the injury in determining whether alleged losses qualify as other property damage. Specifically, in the context of a commercial transaction between sophisticated parties, injury to other property is not actionable in tort if the injury was or should have been reasonably contemplated by the parties to the contract. In such cases the failure of the product to perform as expected will necessarily cause damage to other property, rendering the other property damage inseparable from the defect in the product itself.

Palmetto Linen Serv. 205 F.3d at 129-30 (internal quotations and citations omitted). The Fourth Circuit affirmed the district court's dismissal of the plaintiff's tort claims, noting that "business entities must protect their commercial interests up front through the medium of contract. The economic loss rule dictates that [the plaintiff] cannot now obtain in tort a remedy for which it did not bargain." Id. at 130.

The Eighth Circuit faced a similar factual situation under North Dakota law. The plaintiff sued in contract and tort, "argu[ing] that the economic loss doctrine cannot apply here because the damage was not merely to the [defendant]-supplied steel, but also to the building containing the steel and to the oxygen plant and its equipment." Dakota Gasification Co. v. Pascoe Bldg. Systems, a Div. of Amcord, Inc., 91 F.3d 1094, 1099 (8th Cir. 1996). The Eighth Circuit looked to the Supreme Court's admiralty decision in East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 859 (1986), and the Supreme Court's statement that "virtually all machines have component parts, and that to distinguish the component parts from the whole would result in a finding of injury to 'other property' whenever a product injures itself." Dakota Gasification, 91 F.3d at 1100. Like the Third and Fourth Circuits, the Eighth Circuit ultimately rejected the plaintiff's tort claim based on the economic loss doctrine generally rather than an interpretation of the "other property" exception. See id. at 1101.

*c. Cases that Focus on the "Other Property" Exception*

Several other courts have been faced with facts similar to those at bar, and each has concluded that the damage done to a final product by a defective component or ingredient does not constitute damage to property "other than the product itself." Texas federal courts have twice interpreted Texas law such that when a defective product is used as a component in a final product, the damaged final product is also "the product itself," and recovery is only available in contract. In <u>Alcan Aluminum Corp. v. BASF Corp.</u>, defendant supplied plaintiff with insulation foam that was used by plaintiff to construct panels capable of withstanding high heat. 133 F. Supp. 2d. 482, 488 (N.D. Tex. 2001). The foam was allegedly defective, and its subsequent incorporation into the finished panels allegedly damaged the panels. The court concluded that

> if faced with the issue, Texas courts would . . . characterize damage to a product caused by a defective component as "economic loss" rather than damage to "other property," and therefore not subject to recovery under a negligence theory. In this case, the only damage alleged was to the panels, manufactured by Alcan using BASF's product as a structural component. Damage to the panels from any defects in the [foam] . . . was certainly foreseeable, and the parties are sophisticated entities capable of protecting themselves in the contracting process. The damage to the panels was allegedly caused by a defective component rather than "hazardous conditions or a sudden and calamitous occurrence." The court therefore concludes that the economic loss doctrine applies, and that the damage to the panels does not constitute damage to "other property."

<u>Alcan</u>, 133 F. Supp. 2d at 505. Similarly, in <u>Helen of Troy, L.P. v. Zotos Corp.</u>, another Texas court concluded that

> The Texas Supreme Court has not yet addressed the issue of whether a product, containing components manufactured by a defendant and assembled by a plaintiff, would be considered "other property," thus allowing a plaintiff to recover for economic loss to the whole product in a negligence or strict liability action. The Court finds the reasoning of other federal courts that have considered the issue to be persuasive, and concludes that the Texas Supreme Court would adopt the position that such a product is not other property.

14

511 F. Supp. 2d 703, 722 (W.D. Tex. 2006); see also Sanitarios Lamosa, S.A. de C.V. v. DBHL, Inc., No. 04-22973, 2005 WL 2405923, at *6 (S.D. Tex. Sept. 29, 2005) ("The ballcocks are components of toilets, which are the final product plaintiff sold. Plaintiff used the ballcock in assembling the toilet tank and toilet. Plaintiff alleges that the individually purchased component, the ballcock, failed, damaging the completed product, the toilets. Because the toilets are the completed product, neither damage to the toilet tank nor to the toilet itself constitutes damage to 'other property' under Texas law."). To the extent that Texas law and New Jersey law both explicitly limit tort claims to damage to property "other than the product itself," the Texas courts' analyses offer further support for this Court's conclusion that IFF may not pursue a tort claim on the facts presented.

The Court of Appeals of Michigan faced a virtually indistinguishable factual situation in Sullivan Indus. Inc. v. Double Seal Glass Co., Inc. and rendered a decision that supports a finding that the barbeque seasoning at issue is not property "other than the product itself." See 480 N.W.2d 623, 626 (Mich. Ct. App. 1991). In Sullivan Industries, a manufacturer of glass doors and windows brought tort and contract claims against two companies – its supplier of insulated glass units (IGUs) and that supplier's supplier of polysulfide sealant, a component part used in the assembly of the IGUs. "The window manufacturer alleged that defective sealant caused 14,998 IGUs to fail, resulting in catastrophic monetary losses to, and the eventual bankruptcy of, the manufacturer." Id. at 626. Like IFF, the plaintiff in Sullivan sought to recover from its component suppliers for damage done to the product into which the plaintiff incorporated those components. Id. at 626 ("Sullivan began manufacturing doors and windows that contained IGUs in the mid-1970s. An IGU [supplied by one defendant] consists of two panes of glass separated

15

by an air space, held apart by a metal "spacer," and sealed around the perimeter by a polysulfide sealant. The sealant [supplied by another defendant] structurally laminates the two panes of glass together and retards the transmission of moisture or other matter into the enclosed air space."). The court concluded that because "[t]he sealant damaged only IGUs, which were goods subject to the sales transaction", "the trial court . . . clearly erred in finding that the damage suffered by the IGUs constituted damage to property other than the subject goods." Id. at 629-30.

The above cases support a finding that IFF may not pursue a tort claim under New Jersey law on the facts presented. Plaintiff IFF has not directed the Court to any case law in New Jersey or elsewhere in which a court has permitted a party to pursue a tort claim on facts analogous to those at bar. IFF instead attempts to characterize the damage done to the barbeque seasoning as "accidental harm," arguing that to bar their tort claim would render meaningless the PLA's provision for strict liability for harm to property other than the product itself. To the contrary, for the reasons set forth by the courts cited above, it is clear that if IFF's position were to prevail, "contract law would drown in a sea of tort." East River, 476 U.S. at 866 (discussing application of the economic loss rule to admiralty law). The Court will grant Defendant's motion for partial summary judgment as to Count III of Plaintiff's Complaint.

### B. Count IV – Fraudulent Concealment

Defendant also moves for partial summary judgment on Plaintiff's fraudulent concealment claim (Count IV). In Count IV Plaintiff alleges that it spent over two years investigating the origin of the beetle infestation and that it did so in reliance on the erroneous information provided to it by the Defendant.

Both parties apparently agree that New Jersey law should govern Plaintiff's fraud claim. "In New Jersey, the elements for common law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by that person; and (5) resulting damages." <u>Atlantic City Racing Ass'n v. Sonic Fin. Corp.</u>, 90 F. Supp. 2d 497, 504 (D.N.J. 2000). Because there are genuine issues of material fact at least as to knowledge and reliance, the Court denies Defendant's motion for partial summary judgment on Count IV.

## IV. ORDER

**ACCORDINGLY IT IS** on this 12th day of September, 2008

**ORDERED** that Defendant's motion for partial summary judgment as to Count III (products liability) is **GRANTED**; and it is further

**ORDERED** that Defendant's motion for partial summary judgment as to Count IV (fraudulent concealment) is **DENIED**.

/s/   Faith S. Hochberg
**HON. FAITH S. HOCHBERG, U.S.D.J.**